**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. TDC-20-186** |
| | * | |
| **EDWARD T. BUFORD, III, et al.,** | * | |
| | * | |
| **Defendants** | * | |
| | * | |
| | * | |

********

**GOVERNMENT'S OMNIBUS RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTIONS TO SUPPRESS STATEMENTS, DISMISS, AND SEVER**

In July 2020, a grand jury returned an indictment charging Defendants Edward Buford, Kasandra Vilchez-Duarte, and Donnie Amis with conspiring to violate the Anti-Kickback Statute and to commit mail fraud and healthcare fraud in a scheme to defraud the D.C. Medicaid program. Each Defendant has now moved to suppress his or her statements, and Defendant Buford has filed additional pretrial motions. The United States of America respectfully submits this consolidated response in opposition to these motions, specifically, Defendant Kasandra Vilchez-Duarte's Motion to Suppress Statements (ECF No. 61); Defendant Donnie Amis's Motion to Suppress Statements (ECF No. 64); and Defendant Edward Buford's Motion to Suppress Statements (ECF No. 69), Motion to Sever Counts for Trial (ECF No. 70), Motion to Dismiss Count One of the Indictment (ECF No. 71), and Motion to Sever Defendant for Trial (ECF No. 72). For the reasons explained below, each motion should be denied.

## BACKGROUND

### A. Factual Background

Defendant Edward Buford, a licensed dentist and a resident of Maryland, owned International Dental Associates, Inc. ("IDA"), a clinic located in Washington, D.C. ECF No. 1

(Indictment) Count One ¶ 9.  Defendant Kasandra Vilchez-Duarte, Buford's business partner, managed IDA, *id.* ¶ 10, and Defendant Donnie Amis worked for the practice as a patient recruiter, *see id.* ¶ 16. Buford and IDA were enrolled as providers in the D.C. Medicaid program, which provided medical and dental insurance coverage to individuals with low incomes.  *Id.* ¶¶ 1, 9, 12. Although Buford was suspended by Medicaid in 2015, Buford and Vilchez-Duarte continued to bill Medicaid through IDA's provider number, and failed to disclose Buford's suspension when later re-enrolling IDA in Medicaid, despite an application question asking if "you [had] ever been suspended from . . . Medicaid."  *Id.* ¶ 23(m).

As alleged in the indictment, from at least approximately January 2013 until approximately May 2018, Buford and Vilchez-Duarte paid cash kickbacks to Amis and other recruiters, who were tasked with rounding up Medicaid beneficiaries to bring to IDA.  *Id.* ¶ 23(a)-(b).  Amis then offered cash bribes to beneficiaries to induce them to visit and accept services from IDA.  *Id.* ¶ 23(f).  Once the beneficiaries were recruited, Buford and Vilchez-Duarte employed someone to transport them to IDA in a van.  *Id.* ¶ 23(d).

The amount of the kickbacks varied based on the value of services that could be billed to Medicaid for the beneficiaries Amis brought in.  Amis was rewarded with approximately $50 per beneficiary who agreed to be fitted for dentures—a particularly profitable procedure—but was paid less for cleanings.  *Id.* ¶ 23(e).  Buford's text messages to Amis and other recruiters underscore the point, encouraging them to "look [for] Dentures,, Root Canals and Extractions!! Be safe and good hunting!!!!" and reminding them, "PLEASE RECRUIT SOME DENTURES AND EXTRACTIONS!!! We have to keep the office open and working!!!!"  *Id.* ¶¶ 24(b)-(e).  The Defendants, in turn, adopted a similar incentives structure with Medicaid beneficiaries, paying

approximately $20 to those who agreed to be fitted for dentures but only approximately $10 to those who only agreed to receive cleanings.  *Id.* ¶ 23(g)

Properly done, fitting a patient for dentures is a lengthy and involved process, requiring multiple appointments to cast impressions of patients' mouths and making adjustments over several visits before ultimately delivering the patient's custom-fitted dentures.[1]  *Id.* ¶ 18. Given the substantial upfront costs to providers, Medicaid permitted them to submit a global charge for the entire process after a patient's initial appointment.  *Id.* ¶ 19.  But, despite the prolonged process and need for multiple visits, the Defendants paid beneficiaries only for their initial visits; having billed Medicaid at the outset for a beneficiary's dentures, the Defendants did not offer transportation or cash payments for the requisite follow-up appointments.  *See id.* ¶ 23(h).  Many patients did not ultimately receive their dentures; indeed, IDA's premises contained hundreds of sets of undelivered dentures, many of which had been paid for by Medicaid, *id.* ¶ 23(i).

Through this scheme, the Defendants generated substantial billings to Medicaid, under both Buford's and IDA's provider numbers.  From January 2013 to February 2015, Buford and Vilchez-Duarte submitted and caused to be submitted approximately $5.2 million in claims to Medicaid under Buford's individual provider number, including approximately $3.5 million in claims for dentures.  *Id.* ¶ 23(n).  Medicaid paid approximately $2.7 in claims submitted under Buford's provider number, including approximately $2 million for dentures.  *Id.*  In addition, from February 2014 through May 2018, the Defendants submitted and caused to be submitted approximately $12 million in claims to Medicaid, including approximately $7.7 in claims for dentures.  *Id.* ¶ 23(o).

---

[1] As noted in the indictment, Medicaid typically will pay for a set of dentures only every five years. Consequently, if a provider billed Medicaid for a set of dentures for a given beneficiary but did not actually deliver them to that individual, the individual generally would be ineligible to receive coverage for another set of dentures for a five-year period.  *See id.* ¶ 20.

Medicaid paid approximately $6.4 million in claims submitted through IDA, including approximately $4.5 million in claims for dentures.  *Id.*

## B.  The Charges

On July 13, 2020, the grand jury returned an indictment charging each Defendant with two counts.  In Count One, the Defendants are charged with conspiracy in violation of 18 U.S.C. § 371. In particular, the Defendants are charged with conspiring (a) to defraud the United States by impairing, impeding, obstructing, and defeating the lawful government functions of the D.C. Department of Health Care Finance, the government agency that administers the D.C. Medicaid program (i.e. a *Klein* conspiracy[2]), (b) to violate the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a7b(b)(2)(A), by offering and paying healthcare kickbacks to Amis and others to refer Medicaid beneficiaries, and (c) to violate the AKS, 42 U.S.C. § 1320a7b(B)(1)(A), by soliciting and receiving healthcare kickbacks.  *See id.* ¶ 22.  In addition, in Count Two, the Defendants are charged with conspiracy to commit mail fraud and healthcare fraud—particularly to defraud Medicaid.  *Id.* Count Two ¶ 2.  As alleged in the indictment, the manner and means of this conspiracy is the same as the conspiracy charged in Count One.  *Id.* Count 2 ¶ 3 (incorporating subparagraphs (a) through (o) of paragraph 23 of Count One).

## C.  The Defendant's Statements

### 1.  Buford

#### a.  Pre-Arrest Statements

On May 31, 2018, agents executed a search warrant on IDA's premises. While the search

---

[2] *See United States v. Klein*, 247 F.2d 908, 915 (2d Cir. 1957); *United States v. Vogt*, 910 F.2d 1184, 1202 (4th Cir. 1990).  So-called *Klein* conspiracies commonly involve conspiracies to impede and obstruct the IRS in collecting taxes but include "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Vogt*, 910 F.2d at 1202 (internal quotation marks and citation omitted).

was ongoing, Buford arrived at IDA.  Buford then agreed to speak with agents.  *See* Ex. A (FBI 302, Buford May 31, 2018 Interview 1).  Buford was not under arrest, handcuffed, or otherwise in custody during this interview, which took place in an open area on the second floor of IDA's offices.  Buford retained access to his cellphone while the interview took place.  At two points, he showed agents photographs on his phone.  *Id.* at 1, 3.  And shortly after the interview began, Buford took a telephone call and spoke on the phone for approximately two minutes.  *Id.* at 1.  Buford told agents that the individual on the phone was his attorney, and then continued speaking with the agents.  *Id.*  During this interview, Buford stated, among other things, that he sent recruiters to shelters and commissaries to find patients in need of dentures and claimed that he paid the recruiters, in cash, approximately $15 to $20 per patient that needed dentures, *id.* at 2-4.

Buford was not told he had to stay at the search location.  Nevertheless, following this interview, Buford chose to remain in IDA's offices while the search continued.  Shortly after 1:00 p.m., agents asked to speak with him again, and Buford agreed.  *See* Ex. B (FBI 302, Buford May 31, 2018 Interview 2).  This interview also took place in IDA's office space.  *Id.*  Again, Buford was not in custody or under arrest.  In this statement, Buford again acknowledged his practice of paying both recruiters and patients. *Id.* at 2.  With respect to the many dentures that IDA failed to deliver, Buford claimed that IDA attempted to contact the patients to retrieve their denture but stated that if patients did not come in to get the dentures, it was "on them."  *Id.* at 1.

During the search of IDA's office, Buford informed agents that he also maintained a storage unit in Silver Spring, Maryland.  *See* Ex. C (FBI 302, Buford May 31, 2018 Consent to Search).  Buford signed a written consent to search for the storage unit, stating that he had been advised of his right to refuse consent and gave his permission voluntarily.  *Id.* at 2.  Buford further asked to ride with agents in an FBI van between IDA's office and the storage unit in order to show

the agents where the unit was located.  *Id.* at 1.  During the trip, Buford began to make statements to agents, apparently in defense of his conduct, such as denying that he had committed fraud. Ex. D (FBI 302, Buford May 31, 2018 Interview 2).  After Buford initiated this conversation, agents spoke with him further in the FBI van.  *See id.*

Following the search of IDA's offices, Buford repeatedly called agents, primarily seeking information about the status of the investigation and the records seized.  On June 6, 2018, he contacted an FBI agent to request a copy of the search warrant, which the agent provided by email. Ex. E (FBI 302, Buford June 6, 2018 Telephone Call).  During this call, Buford commended the FBI's professionalism and responsiveness to his and IDA's inquiries.  *Id.*  Because of Buford's repeated attempts to contact the investigative team, including the attorney for the United States, on October 25, 2018, agents called Buford to inform him that the DOJ attorney would prefer to speak with Buford only once he was represented by counsel.  Ex. F (FBI 302, Buford Oct. 25, 2018 Telephone Call).  During this call, agents also discussed with Buford issues relating to the return of dentures seized from IDA's offices.  *See id.*

b.  Post-Arrest Interview (July 22, 2020)

An interview of Buford was also conducted at the time of his arrest on July 22, 2020.  As reflected in the audio recording of the interview, at the outset, Buford was advised of his *Miranda* rights.  Ex. G (Audio Recording of Buford Post-Arrest Interview) at 00:16-1:34; Ex. H (Transcript of Recording of Buford Post-Arrest Interview) at 1:15-1:28.[3]  The agent then asked Buford if he was "willing to answer questions without a lawyer present," and he agreed.  Ex. G at 1:34-1:42; Ex. H at 1:30-33.  Buford also signed a written advice of rights form.  Ex. I (Buford Signed Advice of Rights). The agent then confirmed that Buford was free to stop the interview at any time.  Ex.

---

[3] Recording citations are to MINUTE:SECOND. Transcript citations are written as PAGE:LINE.

G at 2:15-2:37; Ex. H at 2:2-6 ("I can stop at any time, right? . . . . Q: Correct.").  After speaking with agents for a time, Buford said that he "need[ed] to - to talk with my lawyer from this point on," and the agents immediately ended the interview.  Ex. G at 23:02-23:27; Ex. H at 15:13-24.

  **2. Vilchez-Duarte**

   a. <u>Pre-Arrest Statements</u>

  On May 31, 2018, Vilchez-Duarte, like Buford, arrived at IDA while the search of the premises was ongoing and agreed to speak with agents.  She was interviewed by two agents, one from the Federal Bureau of Investigation and one from the District of Columbia, Office of Inspector General, in open area on an upper floor of the building.  *See* Ex. J (D.C. OIG MOI, Vilchez-Duarte May 31, 2018 Interview).  Agents never suggested to Vilchez-Duarte that she was unable to stop the interview and leave, nor did she suggest that she wished to do so.  Vilchez-Duarte, among other things, described the use of recruiters by the clinic, acknowledged that patients were paid to come to the clinic, and admitted obtaining money from the bank to make such payments.  *Id.* at 3.

  During the interview, Vilchez-Duarte informed agents of a storage unit, located just "up the street" from IDA's offices.  *Id.* at 2.  She consented to a search of the storage unit, signing a consent to search form that advised her of her right to refuse consent and stating that she gave the permission voluntarily.  Ex. K (FBI 302, Vilchez-Duarte May 31, 2018 Consent to Search) at 1, 4.  Vilchez-Duarte, accompanied by her husband, later met with agents at the storage facility and permitted them access to the unit.  *Id.* at 1.  Vilchez-Duarte was free to leave and, in fact, did so.  She verbally indicated to agents that she did not want to stay and departed with her husband.  *Id.*

  After this, Vilchez-Duarte communicated with agents by telephone on several occasions.  An agent contacted her to discuss a money pouch located during the search, and Vilchez-Duarte

stated that she had withdrawn the money from the bank to pay recruiters and patients.  Ex. L (FBI 302, Vilchez-Duarte May 31, 2018 Telephone Call).  Vilchez-Duarte also contacted agents by phone and met with them in person to coordinate the return of certain patient files seized during the search.  *See* Ex. M (FBI 302, Vilchez-Duarte June 1, 2018) (describing meeting with Vilchez-Duarte and IDA office manager to discuss patient files and phone call by Vilchez-Duarte to agent to request return of timecards); Ex. N (FBI 302, Vilchez-Duarte June 1, 2018) (describing Vilchez-Duarte text message to agents requesting patient files and subsequent telephone calls).

b.  Post-Arrest Interview (July 22, 2020)

Vilchez-Duarte was arrested on July 22, 2020.  Following her arrest, when Vilchez-Duarte was placed in the transport vehicle, Vilchez-Duarte was advised of her *Miranda* rights and agreed to speak to agents without a lawyer present.  Ex. O (HHS-OIG OI-3, Vilchez-Duarte July 22, 2020 Interview).  The interview took place in an interview room at the Greenbelt Police Department and was audio and video recorded.  Ex. P (Audio Recording of Vilchez-Duarte Post-Arrest Interview, part 1); Ex. Q (Transcript of Recording of Vilchez-Duarte Post-Arrest Interview, part 1); Ex. R (Audio Recording of Vilchez-Duarte Post-Arrest Interview, part 2); Ex. S (Transcript of Recording of Vilchez-Duarte Post-Arrest Interview, part 2).  As shown on the recording, at the commencement of the interview, an agent again advised of Vilchez-Duarte of her *Miranda* rights.  Ex. P at 4:39-5:08; Ex. Q at 2:15-22.  Vilchez-Duarte confirmed she understood her rights and that she wanted to talk.  Ex. P at 4:39-5:11; Ex. Q at 2:15-26.  Near the close of the interview, Vilchez-Duarte asked the interviewing agent about the case agent and noted that she had been "callin' her," that is, the agent  Ex. R at 17:19-17:36; Ex. S at 15:42-7.

### 3.   Amis

Amis moves to suppress two sets of statements:   statements to Social Security Administration ("SSA") officials in October 2018, and statements from a post-arrest, *Mirandized* interview.

#### a.   Statements to Social Security Administration Officials

The FBI provided information to the SSA, Office of the Inspector General ("SSA-OIG"), that Amis—who was receiving disability benefits—had been working for IDA.  Ex. T (SSA-OIG Sept. 20-Oct. 15, 2018 Report of Investigation) at 2.  Having received information that Amis was, in fact, able to work, SSA-OIG requested that non-law enforcement personnel at the SSA at initiate a review of Amis's benefits.  *Id.* at 2.  At the request of an SSA employee, Amis came to an SSA field office on October 5, 2018 and spoke to a claims specialist—not an SSA-OIG agent.  *Id.* at 2-3.  The claims specialist informed Amis, accurately, that SSA could review his benefits anytime it received information that may affect his payments and eligibility.  *Id.* at 2.  An SSA-OIG agent positioned nearby overheard Amis deny self-employment or the receipt of money from any company.  *Id.* at 3.

On October 25, 2018, an SSA-OIG agent contacted Amis by telephone and asked to meet the following day.  Ex. U (SSA-OIG Oct. 23-26, 2018 Report of Investigation) at 2.  Amis agreed. The meeting took place in an interview room at the SSA Anacostia field office.  Amis was neither under arrest, nor handcuffed, and he was free to leave at any time.  During the interview, Amis denied receiving any money from IDA.  *Id.* at 3.

#### b.   Post-Arrest Interview

Amis was interviewed during transport following his arrest on July 22, 2020.  Ex. V (FBI 302, Amis July 22, 2020 Interview).  Prior to being interviewed, Amis was provided with a written

advice of rights form and informed orally of his *Miranda* rights. *Id.* at 1. Amis stated he understood and signed the form, stating that he had read the statement of his rights, understood his rights, and was willing to answer questions without a lawyer present. *Id.*; Ex. W (Amis Advice of Rights Form). Among other things, Amis told agents that he had resumed working for Buford as a recruiter approximately two weeks prior to his arrest. Ex. V at 1-2.

## ARGUMENT

### I.   THE DEFENDANTS' STATEMENTS SHOULD NOT BE SUPPRESSED

Each Defendant moves to suppress some or all of their statements to law enforcement. (*See* ECF 69; ECF 61; ECF 64.) Because the Defendants' pre-arrest statements were voluntary and non-custodial, and because the Defendants knowingly and intelligently waived their *Miranda* rights prior to their post-arrest interviews, the motions should be denied.

#### A.  Legal Standard

##### 1.  Voluntariness

A statement will be considered "involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc). For a statement to be deemed involuntary under the Due Process Clause, it must be obtained by (i) threats or violence; (ii) direct or implied promises; or (iii) the exertion of improper influence. *See id.* The voluntariness of a statement is to be determined from the "totality of all the surrounding circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation. *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980). The test of voluntariness is whether the defendant's will has been "overborne" or his "capacity for self-determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *see also United States v. Gray*, 137 F.3d 765, 771 (4th

Cir. 1998). "[C]oercive police activity is a necessary predicate" to any finding that a confession was involuntary, *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), but "[t]ruthful statements about [a defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." *Braxton*, 112 F.3d at 782 (internal quotations omitted).

### 2. *Miranda* Warning

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court "mandated the use of procedural measures to ensure that defendants, when subjected to custodial interrogations, are advised of their Fifth Amendment rights." *United States v. Azua-Rinconada*, 914 F.3d 319, 325 (4th Cir. 2019). These procedural safeguards apply only "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444; *see also United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010) (explaining that while "'[a]ny interview'" of a suspect "'will have coercive aspects,'" "only when there is a custodial interrogation is it necessary for the police to provide the suspect with Miranda warnings" (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam))); *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) ("Absent formal arrest, *Miranda* warnings only apply where there has been such a restriction on a person's freedom as to render him 'in custody.'" (internal quotation marks and citation omitted)).

"When determining whether an interrogation is custodial for purposes of *Miranda*, a court asks whether, under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest." *Azua-Rinconada*, 914 F.3d 319, 325–26 (4th Cir. 2019) (internal quotation marks omitted). The key question is whether, viewed objectively, "'a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* at 326 (quoting *United States v. Hashime*, 734 F.3d 278, 282–83 (4th Cir. 2013)); *see*

11

*also Parker*, 262 F.3d at 419 (noting that the inquiry depends not on "the subjective views of either the interrogating law enforcement officers or of the person being questioned," but on "the objective circumstances of the interrogation" (citation omitted)).  If a reasonable person would have felt free to end the interview and leave, the suspect cannot be said to have been in custody. *See United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007).

### B.  Buford

#### 1.  Buford's pre-arrest statements were non-custodial and voluntary

Buford was not in custody during the interviews conducted during the search of IDA's premises.  All relevant factors suggest that a reasonable man in Buford's position would have understood he was free to end the interview and leave.  Buford appeared at IDA's offices while the search was already ongoing.  The interviews occurred during the day and at his own office. He was not handcuffed or arrested, his freedom of movement was not restrained, and he never indicated that he wished to leave. Buford had free access to his phone—and, indeed, took a phone call mid-interview. Ex. A at 1.  Buford was not told that he had to remain at IDA as agents executed the search warrant but chose to do so. When agents invited him to continue speaking with them, he readily agreed.  Moreover, when Buford consented to the search of a storage unit, Buford requested to ride with agents in an FBI van to and from the unit.  *See* Ex. C.  During the ride, Buford initiated further discussions with the agents.  *See* Ex. D.

Agents' interactions with Buford were professional, and they made no threats or promises to him.  Buford himself commended the FBI for its professionalism in a phone call to an agent days after the search.  Ex. E. Buford continued to attempt to initiate contacts with the investigative team, including calling agents and attempting to contact the DOJ attorney, such that agents ultimately called Buford to tell him that the prosecutor would prefer to speak with him when he

was represented by an attorney.  *See* Ex. F.  Plainly, agents did not coerce Buford into making telephone calls to them, and a reasonable person in Buford's position would have understood that he was free to end those calls whenever he so chose.

These circumstances demonstrate that Buford was not in custody during the execution of the search warrant and that his statements were voluntary.  *See, e.g.*, *United States v. Gitarts*, 341 F. App'x 935, 939 (4th Cir. 2009) (affirming denial of motion to suppress where the defendant "was questioned in his own home," "was not handcuffed or otherwise restrained," and "was not told he was under arrest"); *Parker,* 262 F.3d at 419 (affirming denial of motion to suppress where the defendant "was not handcuffed or otherwise restrained, and the agents did not draw their weapons in her presence.").  Moreover, these events and the totality of circumstances show that Buford's "capacity for self-determination" was not "critically impaired" nor was his will "overborne." *United States v. Pelton*, 835 F.2d 1067, 1074 (4th Cir. 1987).  Far from being coerced into talking to agents or prevented from leaving, the circumstances reveal that Buford was eager to speak with agents and repeatedly chose to do so.  Buford's motion to suppress should be denied as to his pre-arrest statements.

2. <u>Buford validly waived his *Miranda* rights prior to his post-arrest statement</u>

Buford's challenge to his post-arrest statement is similarly without merit.  The recording of the post-arrest interview confirms that agents advised Buford of his *Miranda* rights, and Buford explicitly waived these rights prior to speaking with agents, both by signing the FBI's Advice of Rights form, *see* Ex. I, and by orally agreeing to answer questions without an attorney present, *see* Ex. G at 00:16-1:42; Ex. H at 1:15-33.

There can be no doubt that Buford was properly advised of his rights, given his signed consent form and verbal acknowledgment of his understanding.  His written and oral waivers are

"strong proof as to [their] validity." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  There is no indicia of intimidation or coercion surrounding his audio-recorded statement. Agents did not physically or verbally threaten him or engage in any violent behavior; they made no express or implied promises.  And agents scrupulously observed Buford's rights, ceasing the interview at the point Buford said he wanted to talk with his lawyer.  Ex. G at 23:02-23:27; Ex. H at 15:13-24.

His waiver was both knowing and voluntary, "the product of a rational intellect and a free will."  *Mincey v. Arizona*, 437 U.S. 385, 398 (1978).  Nothing about the statement or its surrounding circumstances indicates that Buford's will was overborne or that he was not acting of his own volition.  *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (explaining that, while *Miranda* does not "dispense with the voluntariness inquiry[,] . . . cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare" (internal quotation marks omitted)).

Even if the Court were to find that Buford was in custody when interviewed during the search of IDA—and it should not—any *Miranda* violation with respect to his pre-arrest statements would not result in the suppression of Buford's post-arrest, post-*Miranda* statement.  *See Oregon v. Elstad*, 470 U.S. 298, 314 (1985) (holding that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" to a subsequent *Mirandized* statement); *United States v. Khweis*, 971 F.3d 453, 461-64 (4th Cir. 2020) (finding that earlier, unwarned interviews did not undermine effectiveness of *Miranda* warnings given ten days after unwarned interviews ended); *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005).  Here, the post-arrest statement occurred more than two years after the search of IDA and Buford's initial interview and

in a different location.   Under these circumstances, the earlier interview cannot limit the effectiveness of Buford's clear *Miranda* waiver following his arrest.   Given Buford's voluntary, knowing, and intelligent waiver, his motion should be denied as to this statement as well.

### C.  Vilchez-Duarte

1.   Vilchez-Duarte's pre-arrest statements were non-custodial and voluntary

Contrary to Vilchez-Duarte's argument, *see* ECF No. 61, she was not in custody when interviewed during the search warrant's execution at IDA.   The totality of the circumstances reveal that the interview was non-custodial and her statements were voluntary.

Like Buford, Vilchez-Duarte arrived at IDA's premises after the search had begun.   After Vilchez-Duarte agreed to speak, two agents interviewed her on IDA's premises, in an open area on an upper floor.   Vilchez-Duarte was not arrested.   Agents never suggested to Vilchez-Duarte that she was unable to stop the interview and leave, nor did she suggest that she wished to do so. To the contrary, after the interview, she willingly met agents at a nearby storage facility where patient files were stored.   She was not isolated from others but traveled with her husband. At the storage facility, she consented to the search of the unit and continued to speak with agents—both in person and, later, by phone. There can be no doubt that Vilchez-Duarte remained free to leave at this time—she decided to do so, departing with her husband as agents searched the unit.

Vilchez-Duarte, like Buford, also continued to affirmatively contact agents following the search to request the return of certain items.   Vilchez-Duarte herself noted during her post-arrest interview that she had been calling the case agent.   *See* Ex. R at 17:19-17:36; Ex. S at 15:42-7. These interactions were cordial, and, in many cases, the agents accommodated her requests.

The circumstances described above, and as will be established at the hearing, demonstrate that Vilchez-Duarte—like Buford, *see supra*—was not in custody when interviewed on May 31,

2018.  Nor were her statements during that interview, or in subsequent telephone calls and interactions with agents, the product of coercion or threats.  There is no basis to conclude that Vilchez-Duarte's will was overborne or her capacity for self-determination critically impaired.

### 2. Vilchez-Duarte validly waived her *Miranda* rights prior to her post-arrest statement

As described above, Vilchez-Duarte was twice advised of her *Miranda* rights following her July 22, 2020 arrest—first, while in the transport van in transit to the police station, Ex. O, and, later, while situated in an interview room, as captured on the video recording.  Ex. P at 4:39-5:11; Ex. Q at 2:15-26.  Vilchez-Duarte confirmed she understood and wished to continue.  *Id.*  The recording reveals that the interviewing agent was professional, courteous, and made no threats or promises.  As with Buford, *see supra*, there is no basis to conclude that Vilchez-Duarte's will was overborne or her statements involuntary.  In light of Vilchez-Duarte's knowing, intelligent, and voluntary *Miranda* waiver, her motions should be denied.  Further, for the same reason stated above with respect to Buford, even if the Court were to find a *Miranda* violation with respect to Vilchez-Duarte's pre-arrest interview, the motion should be denied as to her post-arrest statement.

### D. Amis

### 1. Amis's statements to SSA officials should not be suppressed

Amis also moves to suppress his statements to SSA officials. (ECF No. 64.) Amis argues that he spoke to SSA personnel on multiple occasions based on a belief he might lose his disability benefits and without being advised of his *Miranda* rights. (Id. at 1.) But SSA personnel never threatened to terminate his benefits if he did not participate in interviews, and none of these statements were custodial. Accordingly, the Court should deny Amis's motion.

A reasonable person in Amis's position would have understood that he was free to leave during his initial interaction with an SSA claims specialist on October 5, 2018.  *See* Ex. T.  The

claims specialist never suggested that she was acting as an agent of law enforcement or that the interview was part of a criminal investigation. Amis had no basis to believe that the interview was anything but a routine bureaucratic matter.

While the SSA-OIG agents who interviewed Amis on October 26, 2018 were law enforcement officers, the circumstance of that interview also revealed that Amis was not in custody. Amis met the agents at an agreed-upon time that they had arranged by telephone the prior day. The interview occurred during regular business hours at an SSA field office, not a police station. Amis arranged his own transportation to and from the location. The government anticipates that the evidence at the hearing will show Amis was informed that he remained free to leave. Agents maintained a cordial tone. He was not handcuffed, nor was he isolated from contact with others. He called his son during the interview to confirm a date. *See* Ex. U. Amis never indicated that he was unwilling to speak with agents. A reasonable person would have felt free to leave under these circumstances.

Amis complains that because he "believed that he *had* to talk to the agents to maintain his benefits," his interviews with SSA personnel were "inherently coercive." (ECF No. 64 at 4.) Amis's subjective view is of no moment in determining whether he was in custody for purposes of *Miranda*. As discussed above, this inquiry is an objective one, based on the totality of the circumstances. *See Azua-Rinconada*, 914 F.3d at 325–26. Even if Amis felt he should answer SSA personnel's questions out of concern that he might lose his benefits, any such concern does not render the interview custodial for *Miranda* purposes. He remained physically unrestrained and was free to leave; as such, his concern "was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984) (finding no custodial interrogation during a defendant's meeting

with his probation officer). Consequently, *Miranda* warnings were not required. *See, e.g., United States v. Whitaker*, 735 F. App'x 672, 675 (11th Cir. 2018) ("That [defendant] may have felt subjectively compelled to comply with [agents] out of concern about losing her . . . SSA benefits does not change our conclusion [that defendant was not in custody]."); *United States v. Bundy*, No. 08-196-P-H, 2009 WL 902064 at *14 (D. Maine Mar. 31, 2009) (finding no custody for *Miranda* purposes in suspect's interview by SSA-OIG agents at an SSA field office where defendant was not under arrest and remained free to leave).

Furthermore, as agents did not threaten to terminate his benefits if he refused to participate in interviews, his argument that economic coercion rendered his statements involuntary is without merit. The cases on which Amis relies—*Garrity v. New Jersey*, 385 U.S. 493 (1967) and *United States v. Giddins*, 858 F.3d 870, 884 (4th Cir. 2017)—are inapposite. Neither *Garrity* nor *Giddins* directs that a defendant's fear of potential economic consequences necessarily renders his statement involuntary and thus inadmissible. They do not dictate that outcome here.

In *Garrity*, the Supreme Court prohibited government entities from "us[ing] the threat of discharge to secure incriminatory evidence against an employee." 385 U.S. at 499. The case involved police officers who confronted a clearly defined choice between incriminating themselves and losing their jobs. *Id.* at 497. Before being questioned, they were warned that their statements could be used in criminal proceedings against them, and that, although they could refuse to answer to avoid self-incrimination, doing so may result in their termination. *Id.* at 494. Given this unambiguous choice, their statements were deemed involuntary. *See id.* at 497.

Similarly, in *Giddins*, officers "threatened to indefinitely retain [the defendant's] car if he failed to sign the *Miranda* waiver and answer their questions." 858 F.3d at 882. The Fourth Circuit held that this threat constituted improper coercion because the defendant "relied on his car to get

him to his job, and it was the means of maintaining his livelihood." *Id.* at 883.  As in *Garrity*, the *Giddins* defendant faced a stark choice between self-incrimination and preserving his livelihood.

Amis confronted no such choice.  SSA personnel did not tell him that he would lose his benefits if he refused to cooperate.  At most, Amis was informed that SSA was undertaking a review of his benefits.  This was accurate.  Having received credible information that he was working, SSA was reviewing whether he was, in fact, eligible for benefits.  *See Braxton*, 112 F.3d at 782 ("[t]ruthful statements about [a defendant's] predicament are not the type of coercion that threatens to render a statement involuntary.").

That such review might result in a loss of Amis's benefits—because he was, indeed, working for IDA—did not result in coercion, as the results of this review did not depend upon his willingness to speak with agents.  Amis may have chosen to lie to SSA personal in an attempt to make it appear that he was eligible for benefits.  However, the Fifth Amendment "does not protect against hard choices," *United States v. Solomon*, 509 F.2d 863, 872 (1975), but only against coercion that denies one the opportunity to make such choices of his own accord. *See, e.g.*, *United States v. Roberts*, 660 F.3d 149, 155-57 (2d Cir. 2011) (finding no unconstitutional economic coercion where an employee was told that lack of cooperation in an investigation would result in report of arrest to agency that controlled access to airport area in which he worked); *United States v. Stein*, 233 F.3d 6, 15 (1st Cir. 2000) ("Where, however, invocation of the Fifth Amendment does not, by itself, result in forfeiture of the job or license in question, the fact that claiming the Fifth may, as a practical matter, result in damage to ones chances of retaining the privilege at stake does not necessarily establish a constitutional violation.").[4]

---

[4] Mere regulatory requirements that SSA beneficiaries disclose their work histories to confirm their eligibility for benefits do not violate the Fifth Amendment.  *Ciccone v. Sec'y of Dep't of Health & Hum. Servs. of U.S.*, 861 F.2d 14, 17-18 (2d Cir. 1988).  An applicant is "not compelled

Any economic pressure that Amis felt to participate in interviews did not rise to the level of coercion articulated in *Garrity* and *Giddins*. Accordingly, the Fifth Amendment is not implicated. Amis's statements to SSA personnel need not be suppressed.

2. Amis validly waived his *Miranda* rights prior to his post-arrest statement

Following Amis's arrest on July 22, 2020, and prior to interviewing him, agents advised Amis of his *Miranda* rights.  Amis waived his rights by stating he understood and signing the FBI's Advice of Rights form.  Ex. V; Ex. W.  As reflected in the written, signed waiver, Amis relinquished his rights voluntarily, knowingly and intelligently.  *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  The evidence at the hearing will show that the agents made no promises or threats.   Lacking any law enforcement coercion, Amis's argument that his statement was involuntary fails. *See Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986) (holding that coercive police activity is a necessary predicate to determining that *Miranda* waiver is involuntary).

Amis contends that he has a history of mental illness.  But, while a defendant's mental health condition is "a significant factor in the 'voluntariness' calculus . . . this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Connelly*, 479 U.S. at 164 (1986).  The mere fact of Amis's mental illness does not render him incapable of waiving his rights. *See, e.g.*, *United States v. Robinson*, 404 F.3d 850, 860–61 (4th Cir. 2005) (upholding waiver of rights by sixteen-year-old defendant with an I.Q. of 70 who was "streetwise," expressed no inability to understand rights as they were read, and waived them when questioned a third time after two prior readings).  *Cook v. Kernan*, the Ninth Circuit habeas case on which Amis

---

to file for social security benefits," but the government need not "give benefits to all those who apply regardless of their compliance with regulations."  *Id.*

relies, featured multiple expert reports detailing the petitioner's "cognitive deficits" that rendered him "vulnerable to suggestibility and confabulation"; "indications of his confusion or lack of comprehension during the interview"; and his assertion that he did not previously understand his right to counsel.  948 F.3d 952, 963, 967 (9th Cir. 2020).[5]  There is no similar evidence here. Because his *Miranda* waiver was knowing and intelligent, Amis's motion should be denied.

## II.     BUFORD'S MOTION TO DISMISS COUNT ONE IS MERITLESS

Buford moves to dismiss Count One of the Indictment.  Relying on the Fifth Circuit's decision in *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004), Buford claims that payments to Amis do not qualify as healthcare kickbacks under the AKS.  His arguments improperly ask the Court to look beyond the indictment's language and, in all events, are without merit.

Under Rule 12(b)(3)(B)(v), a defendant may file a motion to dismiss challenging an indictment for failure to state an offense.  "[A] challenge to the sufficiency of the indictment" is "ordinarily limited to the allegations contained in the indictment."  *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012).  To warrant dismissal, a movant must establish that the indictment's allegations, "even if true, would not state an offense." *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004); *see also United States v. Wills*, 346 F.3d 476, 488 (4th Cir. 2003) (noting that "courts lack authority to review the sufficiency of evidence supporting an indictment").  Further, "a court assessing a motion to dismiss must keep in mind that the indictment need not set forth with detail the government's evidence; nor need it enumerate every possible legal and factual theory of defendants' guilt."  *United States v. Le*, 310 F. Supp. 2d 763, 772 (E.D. Va. 2004) (internal quotation marks omitted).

---

[5] Ultimately, these factors were not dispositive. The Ninth Circuit held that the lower court "had a reasonable basis to reject Cook's challenge to the validity of his *Miranda* claim" and affirmed its rejection of his challenge. *Id.* at 968.

Count One of the Indictment sufficiently alleges a conspiracy to violate the AKS.  It alleges that the Defendants conspired "to knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind from . . . to Amis and others to induce Amis and others to refer beneficiaries to IDA . . ." and "to knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind . . . to induce Amis and others to refer beneficiaries to IDA . . . ."  ECF No. 1, Count 1 ¶ 22.  This language mirrors the statutory language of the AKS, 42 U.S.C. §§ 1320a-7b(2)(A) and 1320a-7b(1)(A).  In addition, in the manner and means of the conspiracy, the Indictment alleges, among other things, that:

- "**BUFORD** and **VILCHEZ-DUARTE** offered and paid kickbacks to **AMIS** and others in exchange for referring Medicaid beneficiaries to IDA for dental services." (¶ 23(a))

- "**AMIS** solicited and received kickbacks from **BUFORD** and **VILCHEZ-DUARTE** in exchange for referring beneficiaries to IDA for dental services billed to Medicaid." (¶ 23(b)).

As it tracks the relevant statutory language, Count One states a legally sufficient cause of action. *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994) ("An indictment that tracks the statutory language is ordinarily valid." (citations omitted)).  Buford's arguments that the payments to Amis do not qualify as kickbacks represent a premature attempt to challenge the government's evidence.

Even assuming that Buford's argument was properly raised at this stage, it is incorrect. Buford contends, without citation, that under the AKS, the referring individual must "have some authority on which to make the referral," stating that "[i]n most cases the referring party is itself a physician or provider of services in a unique position to make a referral that a benefit would act upon based upon their trust and relationship with the referring party."  ECF No. 71 at 2.  Buford then argues that because no relationship of trust or reliance existed between Amis and the

22

beneficiaries, Amis had "no decision-making capacity over the beneficiaries."  ECF No. 71 at 3.

While such individuals may be the recipients of kickbacks, nothing in the language of the AKS limits is application to healthcare providers or individuals occupying such a position of trust. Rather, the statute broadly prohibits remuneration paid "to *any* person" to induce referrals for services for which payment may be made by Federal health care programs.  42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added); *see United States v. Crane*, 781 F. App'x 331, 334 (5th Cir. 2019) (noting "that § 1320a-7b(b)(2) broadly criminalizes referrals paid to 'any person'"); *Stop Illinois Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 750 (7th Cir. 2020) ("[T]he definition of a referral under the Anti-Kickback Statute is broad, encapsulating both direct and indirect means of connecting a patient with a provider. It goes beyond explicit recommendations to include more subtle arrangements. And the inquiry is a practical one that focuses on substance, not form.").[6]

Accordingly, courts have repeatedly affirmed convictions involving violations of the AKS in which payments were made, as in this case, to patient recruiters—not healthcare providers.  *See*, *e.g.*, *Crane*, 781 F. App'x at 334 (rejecting argument by defendant who "worked as a patient recruiter, van driver, and psychiatric technician" that he "was paid for advertising . . . , rather than receiving kickbacks"); *United States v. Sosa*, 777 F.3d 1279, 1291–92 (11th Cir. 2015) (finding sufficient evidence of conspiracy to pay healthcare kickbacks where defendant was a partner in a clinic that paid kickbacks to a patient recruiter, disguised as transportation payments, as well as paying patients); *United States v. Fowler*, 819 F.3d 298, 302, 310 (6th Cir. 2016) (finding sufficient evidence to affirm conviction for conspiracy to pay or receive healthcare kickbacks of "marketer"

---

[6] Buford also incorrectly asserts, without citation, that the referral must be based "solely" on obtaining remuneration. ECF 71 at 2.  The statute includes no such limitation and "every circuit court to address the question has determined a defendant violates the AKS when 'one purpose'"— not necessarily the sole purpose—"of referral decisions is to receive renumeration."  *United States v. Vora*, 488 F. Supp. 3d 554, 563 (W.D. Ky. 2020) (collecting cases).

who agreed "to receive payment (kickbacks) in exchange for bringing patients to [a] pharmacy"). *Cf. United States v. Manzano*, 793 F. App'x 360, 363 (6th Cir. 2019) (rejecting defendant's arguments of government misconduct and affirming fraud and kickback convictions for home health agency owner who, among other things, paid patient recruiters a per-patient fee).

Buford relies upon a single case in support of his argument: *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004). In Miles, the defendants owned APRO, a home health agency. *Id.* at 475. They engaged Premier, a public relations firm, to distribute information regarding APRO to local doctors' offices. *Id.* at 479. If a physician decided that a patient needed home health services, the physician could contact Premier, which would then provide APRO with the patient's name and Medicare number. *Id.* For each patient that APRO enrolled in this manner, the defendants paid Premier $300. *Id.* The Fifth Circuit, considering the question on appeal from the defendants' trial convictions, held that Premier's activities did not constitute "referrals" within the meaning of the AKS. *Id.* at 480. Only "[a]fter a doctor had decided to send a patient to APRO" did the doctor's office contact Premier, so "[t]here was no evidence that Premier had any authority to act on behalf of a physician in *selecting* the particular home health care provider." *Id.* Because the "payments from APRO to Premier were not made to the relevant decisionmaker as an inducement or kickback for sending patients to APRO," the Fifth Circuit concluded that the payments were not illegal kickbacks and vacated the convictions. *Id.* at 480-81. Buford grasps on this language in support of his argument.

Seeking to seeking to avoid misconstructions of *Miles*, however, the Fifth Circuit has since emphasized the narrowness of its holding:

> *Miles* . . . stands for a narrow legal proposition: Where advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser 'unduly influence[s]' or 'act[s] on behalf of' the purchaser, the mere fact that

> the good or service provider compensates the advertiser following
> each purchase is insufficient to support the provider's conviction for
> making a payment 'to refer an individual to a person' under 42
> U.S.C. § 1320-7b(b)(2)(A).

*United States v. Shoemaker*, 746 F.3d 614, 628 (5th Cir. 2014). *Shoemaker* further clarified that *Miles* did *not* require that the recipients of kickbacks be "relevant decisionmakers," but rather distinguished "between a *payer's* intent to induce 'referrals,' which is illegal, and the intent to compensate advertisers, which is permissible." *Id. Shoemaker* thus cautions against the very argument that Buford advances. It makes clear that *Miles*—contrary to Buford's argument—does not impose a requirement that a kickback recipient be a "relevant decisionmaker." Indeed, *Shoemaker* warns that reading such a requirement into the AKS "would be tantamount to re-writing the statutory text, which . . . criminalizes payments to 'any person[s],' so long as they are made with the requisite intent." *Id.*; *see also United States v. George*, 900 F.3d 405, 411 (7th Cir. 2018) (agreeing that *Miles* cannot be read to limit liability to "relevant decisionmakers" and finding that conduct of defendant, who operated a referral agency, "fell squarely within the statute" even though doctors had to certify the patients she referred); *Crane*, 781 F. App'x at 334 ("We have discouraged attempts to construe *Miles* broadly, rejecting as untenable a district court's reading of *Miles* to limit drastically the meaning of 'any person,' such that liability cannot attach unless the person' who receive remuneration is a 'relevant decisionmaker' with formal authority to effect the desired referral or recommendation." (internal quotations and citation omitted)).

The instant case bears no resemblance to the facts in *Miles*. Buford and Vilchez-Duarte did not pay Amis to advertise IDA to area doctors or dentists. They paid him and other recruiters a per-patient fee to recruit Medicaid beneficiaries and bring them to IDA to receive services that could be billed to Medicaid. This purpose was explicit: when a recruiter located a beneficiary, IDA confirmed that Medicaid could be billed before transporting the individual to the office.

25

Amis engaged vulnerable population of patients, targeting areas where homeless individuals congregated, and offered them money in exchange for their acceptance of services. Unlike *Miles*, there was no physician making an independent determination about where to refer the beneficiaries. Instead, in exchange for a promise of payment, Amis effectively chose their provider for them. His conduct extended far beyond mere advertising. He directed Medicaid beneficiaries to a specific provider in exchange for cash, and Buford and Vilchez-Duarte offered him payment to induce him to make these referrals. Thus, *Miles* offers no support for Buford's argument. *See Crane*, 781 F. App'x at 331 (rejecting argument under *Miles* that payments from a partial-hospitalization program ("PHP") to defendant who worked as patient recruiter, van driver and psychiatric technician did not violate the AKS, even though the defendant "could not force his patients to attend" the PHP).

Finally, Buford overlooks the differing procedural postures of his case and that of the *Miles* defendants. *Miles* was an appeal after trial in which the defendants argued that the evidence was insufficient to support their conviction. Buford, on the other hand, impermissibly attempts to litigate the indictment's factual allegations and the underlying facts pretrial. The Court should not dismiss a facially sufficient count based on Buford's speculation about what the evidence will show. His motion should be denied.

## III.     BUFORD'S MOTION TO SEVER COUNTS SHOULD BE DENIED

Buford next moves to sever Counts One and Two against him, arguing that the charges of conspiracy to violate the AKS and conspiracy to commit mail and healthcare fraud are improperly joined and should not be tried together. (ECF No. 70 at 2.) He contends that the allegations contained in each are unrelated. Buford is incorrect: his two conspiracies were part of a common scheme to profit based on dental procedures billed to Medicaid, many of which were unfulfilled,

that were incentivized through kickbacks. He has failed to satisfy the heavy burden of demonstrating the need for a severance.

### A. The Counts Are Properly Joined

Under Federal Rule of Criminal Procedure 8, "joinder is permitted under three circumstances: (1) if the offenses are of the same or similar character, (2) if they are based on the same act or transaction, or (3) if they are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan." *United States v. Goldman*, 750 F2d 1221, 1224 (4th Cir. 1984) (internal citation and quotation marks omitted). "Rule 8(a) permits very broad joinder of related counts in the same trial." *United States v. Blair*, 661 F.3d 755, 768 (4th Cir. 2011). Such a rule promotes efficiency and the preservation of limited judicial resources. *See United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008) ("[J]oinder is the rule rather than the exception, because the prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources suggests that related offenses should be tried in a single proceeding.").

The conspiracies charged in Counts One and Two of this case satisfy all three *Goldman* prongs. Though his illegal kickbacks and fraudulent billing constitute distinct violations of law, they shared identical actors, mutual means, and a shared objective—a dual-pronged but unified undertaking. Indeed, as alleged in the Indictment, the time periods and the manner and means of the conspiracies charged in each count are identical. And, as described further below, the evidence of each conspiracy substantially overlaps. Paying kickbacks and defrauding Medicaid were part and parcel of a common scheme.

### B. Defendant Cannot Meet His Burden for Severance Under Rule 14

Under Federal Rule of Criminal Procedure 14(a), a court may grant relief, including severance of properly joined claims, if joinder appears to prejudice the defendant. Fed. R. Crim.

P. 14(a); *see United States v. Cardwell*, 433 F.3d 378, 387 (4th Cir. 2005) (explaining that cases in which joinder under Rule 8 is proper but severance is required are "rare").  This exception is a narrow one, however.  "Under Rule 14, a properly joined claim may be severed *only* if there is a serious risk that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence."  *Blair*, 661 F.3d at 768 (emphasis in original) (internal quotation marks and citation omitted); *see also Zafiro v. United States*, 506 U.S. 534, 539 (1993).  "A defendant making a motion for severance pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice, and it is not enough to simply show that joinder makes for a more difficult defense." *Goldman*, 750 F.2d at 1225.  The Defendant has not and cannot meet his burden here.

Through kickbacks, Buford and Vilchez-Duarte induced Medicaid beneficiaries, referred by patient recruiters, to come to IDA for dental services, which were the subject of fraudulent claims to Medicaid. The indictment alleges that the kickback arrangement was deliberately structured to pay patients only to attend an initial appointment, allowing IDA to bill Medicaid for the full cost of dentures, even though patients were unlikely to return to complete the denture process. The hundreds of dentures on IDA's premises demonstrate that, once it could bill Medicaid, the Defendants had no meaningful interest in providing the services billed and ensuring that patients received their dentures.  Further, the kickback arrangement demonstrates that beneficiaries were not coming to IDA because they were seeking needed dental care, but rather had been induced to accept services in exchange for the promise of money.  The indictment explains the connection between the kickback arrangement and the fraud scheme—and indeed, the mere existence of kickbacks renders the resulting claims fraudulent.

The AKS conspiracy thus is inextricably "related to, and . . . logically and intimately connected together with" the fraud conspiracy. *United States v. Jamar*, 561 F.2d 1103, 1106 (4th

Cir. 1977).  Accordingly, the counts are properly joined and should not be severed.  *See United States v. Vaid*, No. 16-CR-763 (LGS), 2017 WL 3891695, at *5 (S.D.N.Y. Sept. 5, 2017) (denying motion to sever kickback conspiracy from fraud and fraud conspiracy counts, as "[t]he kickbacks are alleged to be integral to the scheme as they induced the [p]aid [p]atients' involvement" and "the kickback conspiracy was the means to recruit the [p]aid [p]atients who were the subject of fraudulent claims").  Given that the same evidence underlies the two crimes, a joint trial furthers the interests of judicial economy. *See, e.g.*, *United States v. Miserendino*, 283 F. Supp. 3d 489, 493 (E.D. Va. 2017) (holding that where "one offense would ordinarily be admissible at a separate trial for the other . . . .  a defendant will not suffer any additional prejudice if the two offenses are tried together" (internal quotation marks and citation omitted)).

Moreover, because the evidence is substantially overlapping as to each count, there is little risk of prejudice to Buford.  Buford acknowledges that evidence of the kickback conspiracy may be relevant to the fraud conspiracy charged in Count Two, but incorrectly claims that evidence of the healthcare fraud would not be relevant to the kickback count.  On the contrary, evidence of the fraud shows that Buford acted knowingly and willfully with respect to the kickback violations. *Cf. United States v. Job*, 387 F. App'x 445, 459 (5th Cir. 2010) (finding that patients' lack of medical need and doctor's perfunctory assessments supported finding that doctor knowingly and willfully violated the law by receiving kickbacks).  In statements to agents, Buford suggested that his payments to recruiters and patients were not inappropriate kickbacks, but that he was helping the community by sending out recruiters to retrieve patients. *See, e.g.*, Ex. B at 2; Ex. D.  That Buford was billing for unnecessary and unfulfilled services, including hundreds of undelivered dentures, and that the structure of his kickback arrangement was designed to allow him to bill Medicaid after

an initial visit while discouraging patients from completing the denture process, belies this defense and supports a finding of willfulness.

Further, it should be noted that Count One includes as an object not only the offering, payment, solicitation, and receipt of kickbacks, in violation of the AKS, but also a *Klein* conspiracy—that is, a conspiracy to defraud the United States.  ECF No. 1, Count One ¶ 22. Evidence of Buford's admission of fraudulent claims for beneficiaries procured through kickbacks would also be admissible in a trial as to Count One for this purpose.

Finally, any risk of jury confusion between the counts may be addressed through appropriate jury instructions.  *See Mir*, 525 F.3d at 357 ("Moreover, any prejudice resulting from a single trial on multiple counts can be cured by other, less restrictive means than severance"). This case involves only two counts, and there is no reason to believe that a properly instructed jury could not separately consider each count.

Accordingly, Buford's motion to sever Counts One and Two should be denied.

## IV.   BUFORD'S MOTION FOR SEVERANCE FROM HIS CODEFENDANTS SHOULD BE DENIED

Finally, Buford moves to sever his own trial from that of his codefendants. (ECF No. 74.) His conclusory assertion that he is entitled to a separate trial falls far short of the factual showing required to justify severance. Joinder of defendants under is proper when an indictment charges all defendants with participation in a single conspiracy, and any resultant prejudice may be cured with a less drastic remedy.

### A.  Co-Conspirators Indicted Together Should Be Tried Together

Federal Rule of Criminal Procedure 8 provides that an indictment may charge two or more defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  Courts

have repeatedly acknowledged the "preference in the federal system for joint trials of defendants who are indicted together.  Joint trials play a vital role in the criminal justice system." *Zafiro*, 506 U.S. at 538 (citations and internal quotations omitted).  Both the Supreme Court and the Fourth Circuit apply a strong presumption in favor of trying defendants together who have been indicted together, especially defendants charged in a conspiracy.  *See United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983); *see also United States v. Young*, 989 F.3d 253, 266 (4th Cir. 2021) ("If two defendants are properly indicted together, courts generally adhere to the principle that defendants indicted together should be tried together . . . ." (internal quotation marks omitted)). The Fourth Circuit instructs that "[b]arring special circumstances, . . . the general rule is that defendants indicted together should be tried together for the sake of judicial economy." *United States v. Rusher*, 966 F.2d 868, 877 (4th Cir. 1992) (internal quotation marks omitted).  And "[j]oinder is highly favored in conspiracy cases," in particular, "over and above the general disposition supporting joinder for reasons of efficiency and judicial economy." *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012) (internal quotation marks and citation omitted); *see also United States v. Lawson*, 677 F.3d 629, 639 (4th Cir. 2012).

Where defendants are properly joined, severance under Rule 14 is warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. Consequently, a defendant seeking severance under Rule 14 must establish that "actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal." *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995) (citations and internal quotations omitted).  "Demonstrating prejudice is a high hurdle." *Young*, 989 F.3d at 266.

31

Given this burden, "severance pursuant to Fed. R. Crim. P.] 14 is rarely granted." *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012).

### B.  Buford Fails To Show a Basis for Severance

Buford does not challenge the Defendants' joinder pursuant to Rule 8(b).  The Defendants are charged as co-conspirators in two counts.  As noted above, conspiracy cases are textbook examples of those in which codefendants should be tried together, given that much—if not all—of the evidence that the government will present in its case-in-chief will pertain to all defendants. *See, e.g.*, *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999) ("Generally, we adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly."). As such, the Defendants should be tried together.

Tacitly accepting that the Defendants were properly joined, Buford argues that severance is necessary to prevent prejudice.  But he fails to meet the heavy burden to show that severance is warranted in this case.  Buford's speculation that the codefendants may blame him for wrongdoing or that he may appear more culpable in the eyes of the jury because of his status as a licensed dentist and the owner of IDA does not establish a basis for severance.  It is well settled that "a defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial."  *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010). *Cf.  United States v. Campbell*, 963 F.3d 309, 318 (4th Cir. 2020) ("[T]he mere fact that evidence against one or more co-conspirator is stronger or more inflammatory than the evidence against others does not necessarily require severance.").  Mere "finger pointing" among codefendants does not warrant severance.  *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002); *see also Lighty*, 616 F.3d at 348 ("The mere presence of hostility among defendants or the desire of one to exculpate himself

by inculpating another are insufficient grounds to require separate trials." (internal quotation marks, citation, and alterations omitted)).

Buford has made no showing that the defenses will present "such a stark contrast" that for the jury "to believe the core of one defense it must disbelieve the core of the other, or that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Lighty*, 616 F.3d at 348–49 (4th Cir. 2010) (internal quotation marks, citation, and alterations omitted). His vague speculation and conclusory argument do not justify separate trials. "Where . . . the defendant fails to state the nature of his defense and in what respect, if any, his defense is irreconcilable with that of his co-defendant, there is no basis to grant the defendant's motion for severance." *United States v. Spitler*, 800 F.2d 1267, 1272 (4th Cir. 1986) (collecting cases).

Nor does the possibility that the government may introduce codefendants' statements at trial establish actual prejudice sufficient to meet Buford's high burden for severance under Rule 14. Under the *Bruton* doctrine, *see* 391 U.S. 123 (1968), the Sixth Amendment prohibits the introduction of a "facially incriminating testimonial statement of a non-testifying codefendant" at a joint trial, "even if the jury is instructed to consider the confession only against the codefendant." *United States v. Benson*, 957 F.3d 218, 228 (4th Cir. 2020). This "rule [i]s a narrow one," as a statement that "incriminates 'inferential[ly]' rather than 'facially' . . . does not implicate *Bruton*." *Id.* (quoting *Richardson v. Marsh*, 481 U.S. 200, 208–09 (1987)).

Buford identifies no particular statements of his codefendants that are testimonial and facially incriminate him. *See United States v. Verges*, 997 F. Supp. 2d 398, 405 (E.D. Va. 2014) (finding that "severance was inappropriate" as the defendant "failed to failed to identify the precise declarations which she contends are problematic under *Bruton*"). Even assuming that the government may seek to introduce any such statements, any possibility of prejudice can be

addressed through redactions or other measures short of the drastic remedy of severance.  *See*, *e.g.*, *Richardson*, 481 U.S. at 211 (holding that redacted codefendant's confession, in conjunction with limiting instruction, avoided *Bruton* issue); *United States v. Min*, 704 F.3d 314, 321 (4th Cir. 2013) (finding that admission of "redacted statements did not offend *Bruton*" and affirming denial of motion to sever); *United States v. Najjar*, 300 F.3d 466, 475 (4th Cir. 2002) (finding no *Bruton* violation where trial judge redacted statements "to eliminate any facial incrimination" of the defendant and provided limiting instruction); *United States v. Mussmacher*, No. CRIM. WDQ-09-0169, 2010 WL 2292214, at *4 (D. Md. June 3, 2010) ("To avoid severance, the Court may (1) suppress the statement if it has little probative value against the defendant who made it, or (2) redact portions of the statement that inculpate the codefendant."); *United States v. Salad*, No. 2:11CR34, 2012 WL 12953886, at *2 (E.D. Va. Nov. 16, 2012) (noting that, under *Bruton*, "the court has several options short of severance," including "at a point closer to the trial date, the *in camera* examination of the United States' evidence in order to evaluate the suitability of redactions and replacements").  *Cf. Gray v. Maryland*, 523 U.S. 185, 192 (1998) (noting the use of separate juries to address *Bruton* concern).  At best, Buford's asserted *Bruton* concerns are premature.

## Conclusion

For the foregoing reasons and those to be stated at the hearing on the motions, each of the Defendants' motions should be denied.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney


_____/s/_____
Jessica C. Collins
Assistant United States Attorney
Jessica C. Harvey
Special Assistant United States Attorney